Argued and submitted October 13, 1999, the sentence of death vacated, and case remanded to the circuit court for further proceedings December 29, 2000

## STATE OF OREGON,
*Respondent,*

*v.*

## ROBERT PAUL LANGLEY, JR.,
*Appellant.*

## (CC 88-C-21624; SC S41885)

16 P3d 489

Jesse Wm. Barton, Deputy Public Defender, Salem, argued the cause and filed the supplemental brief and additional authorities for appellant. With him on the supplemental brief was David E. Groom, Public Defender. On the brief were Sally L. Avera, Public Defender, and Diane L. Alessi, Chief Deputy Public Defender.

Robert P. Langley, Jr., filed a supplemental brief *pro se.*

Robert B. Rocklin, Assistant Attorney General, Salem, argued the cause and filed the briefs and additional authorities for respondent. With him on the brief, supplemental brief, and additional authorities, were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General. Also on the brief was Jennifer S. Lloyd, Assistant Attorney General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, Leeson, and Riggs, Justices.*

_____

* Kulongoski, J., did not participate in the consideration or decision of this case.

CARSON, C. J.

## CARSON, C. J.

This is an automatic and direct review of a judgment that imposed a sentence of death for aggravated murder. *Former* ORS 163.150(1)(g) (1993), *renumbered as* ORS 138.012(1) (1999). *See* Or Laws 1999, ch 1055, § 1 (repealing *former* ORS 163.150(1)(g) (1993)).[1] This is the second time that the case has been before this court. On the first direct review, this court affirmed all but one of defendant's convictions, vacated the sentence of death, and remanded for resentencing due to an error committed at trial. *State v. Langley*, 314 Or 247, 839 P2d 692 (1992), *on recons* 318 Or 28, 861 P2d 1012 (1993) (*Langley I*). For the reasons that follow, we vacate defendant's second sentence of death and remand this case to the trial court for further penalty-phase proceedings.

### BACKGROUND

This case stems from defendant's conviction on 16 counts of aggravated murder for the death of Gray. The facts regarding the crime are set out in *Langley I*, 314 Or at 249-52. At the time when the proceeding in *Langley I* was underway, defendant already had been convicted and sentenced to death for the murder of Rockenbrant. This court subsequently vacated defendant's death sentence in the Rockenbrant proceeding. *See State v. Langley*, 314 Or 511, 840 P2d 691 (1992) (reversing upon ground that evidence of Gray murder erroneously admitted in Rockenbrant proceeding).[2] Defendant murdered both Gray and Rockenbrant while he was living on the grounds of the Oregon State Hospital and participating in a residential Criminal Treatment Program (CTP) for mentally and emotionally disturbed inmates.

As noted, after defendant had been convicted and sentenced to death for the Gray murder, this court reversed the sentence of death and remanded for a new penalty-phase proceeding (remand proceeding). This review stems from that remand proceeding, at which a jury again sentenced

---

[1] In enacting ORS 138.012, the 1999 Legislature renumbered the statute that described this court's review authority in death-penalty cases, but made no substantive change to that authority.

[2] On remand, defendant was sentenced to life imprisonment with a 30-year minimum for the Rockenbrant murder.

defendant to death. On direct review, defendant raises 22 assignments of error, only three of which we address in this opinion.

## TRUE-LIFE SENTENCING OPTION

Defendant's primary assignment of error relates to the trial court's refusal to permit the jury to consider the option of sentencing him to life in prison without the possibility of parole (true life). Defendant argues that the trial court was required to instruct the jury on the true-life sentencing option under *former* ORS 163.150(5) (1993), set out *post*, *renumbered as* ORS 138.012(2) (1999),[3] which, according to defendant, applied retroactively to his remand proceeding. In defendant's view, because he expressly waived any constitutional *ex post facto* objection to retroactive application of the true-life option,[4] *former* ORS 163.150(5)(e) (1993) required the trial court to instruct the jury on that option.

We begin by setting out the relevant procedural history. Gray was reported missing in December 1987, and her body was discovered in April 1988. In November 1989, a jury convicted defendant of 16 counts of aggravated murder for Gray's death. At the time of defendant's trial, aggravated murder proceedings were governed by ORS 163.150 (1989),[5] which recently had been amended by the 1989 Legislature

---

[3] As with *former* ORS 163.150(1)(g) (1993), the 1999 Legislature made no substantive changes when it renumbered *former* ORS 163.150(5) (1993) as ORS 138.012(2). We refer to the 1993 statute throughout this opinion.

[4] Article I, section 21, of the Oregon Constitution, provides, in part: "No *ex-post facto* law * * * shall ever be passed * * *." Article I, section 10, of the United States Constitution, provides, in part: "No State shall * * * pass any * * * ex post facto Law * * *."

[5] ORS 163.150 (1989) provided, in part:

"(1)(a) Upon a finding that the defendant is guilty of aggravated murder, the court, except as otherwise provided in subsection (3) of this section, shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to life imprisonment, as described in ORS 163.105(1)(c), life imprisonment without the possibility of release or parole, as described in ORS 163.105(1)(b), or death. * * *.

"(b) Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

and which, as relevant here, purported to apply retroactively to "trials commencing on or after July 19, 1989." ORS 163.150(4) (1989). Among other things, the 1989 amendments added true life as a sentencing option in aggravated-murder cases. Or Laws 1989, ch 720, § 2. Before the 1989 amendments, only death and life imprisonment with the possibility of parole (ordinary life) were possible sentences for aggravated murder. ORS 163.150(2) (1987).

The trial court in *Langley I* applied ORS 163.150 (1989) retroactively to defendant's case, instructing the jury on the new, true-life sentencing option. The jury unanimously answered "yes" to the four statutory questions set out in ORS 163.150(1)(b) (1989), and the trial court entered a judgment that convicted defendant of aggravated murder and sentenced him to death. *Langley I*, 314 Or at 252, 254 n 5.

In 1992, this court considered the case on direct review and affirmed all but one of defendant's convictions. However, the court concluded that the fourth question, asked of the jury pursuant to ORS 163.150(1)(b)(D) (1989), constitutionally was inadequate under *State v. Wagner*, 309 Or 5, 18, 786 P2d 93 (1990), because it failed to allow for proper consideration of mitigating evidence. Accordingly, the court vacated defendant's sentence of death and remanded the case

---

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) If constitutionally required, considering the extent to which the defendant's character and background, and the circumstances of the offense may reduce the defendant's moral culpability or blameworthiness for the crime, whether a sentence of death be imposed.

"* * * * *

"(2)(a) Upon the conclusion of the presentation of the evidence, the court shall also instruct the jury that if it reaches a negative finding on any issue under paragraph (b) of subsection (1) of this section, the trial court shall sentence the defendant to life imprisonment without the possibility of release or parole, as described in ORS 163.105(1)(b), unless 10 or more members of the jury further find that there are sufficient mitigating circumstances to warrant life imprisonment, in which case the trial court shall sentence the defendant to life imprisonment as described in ORS 163.105(1)(c).

"* * * * *

"(4) * * * Subsection (2) of this section shall apply only to trials commencing on or after July 19, 1989."

to the trial court for further penalty-phase proceedings. *Langley I*, 314 Or at 272. The court declined to consider defendant's additional *pro se* argument that application of the true-life sentencing option violated his constitutional protection against *ex post facto* laws, concluding that, on remand, defendant would be sentenced under the statutory scheme in effect at the time of his crime. In support, the court quoted *State v. Isom*, 313 Or 391, 395, 837 P2d 491 (1992), for the proposition that "the legislature intends that Oregon courts sentence criminal defendants under the statutory scheme in force when a particular criminal act was committed." *Langley I*, 314 Or at 254 n 5.

Both defendant and the state petitioned for reconsideration, which this court allowed to consider the *ex post facto* issue. *Langley I*, 314 Or 247, *on recons* 318 Or at 30 (*Langley I* (on reconsideration)). On reconsideration, the court discussed the then-recent case of *State v. Wille*, 317 Or 487, 505, 858 P2d 128 (1993), in which this court had held that "[r]etroactive imposition of [the true-life sentencing option] violated Article I, section 21, of the Oregon Constitution, and Article I, section 10, of the Constitution of the United States." The court concluded that the constitutional prohibition against *ex post facto* laws discussed in *Wille*, rather than the general rule set out in *Isom*, precluded retroactive application of the true-life sentencing option in defendant's case. *See State v. McDonnell*, 329 Or 375, 384 n 5, 987 P2d 486 (1999) (summarizing *Langley I* (on reconsideration) in that manner). The court adhered to its earlier decision in *Langley I* and vacated defendant's sentence of death, based upon the inadequacy of the fourth question. As with *Langley I*, the court remanded the case to the trial court for further proceedings. *Langley I* (on reconsideration), 318 Or at 32.

At his remand proceeding, which commenced in 1994, defendant changed his strategy regarding the true-life sentencing option and sought to waive his *ex post facto* objection to retroactive application of ORS 163.150 (1989). Defendant specifically argued that the true-life option was available in his remand proceeding under *former* ORS 163.150(5) (1993), which provided for application of the true-life option in penalty-phase proceedings conducted on remand and purportedly applied "to any defendant sentenced to death after

December 6, 1984." *Former* ORS 163.150(5)(e) (1993).[6] The trial court rejected defendant's attempted waiver, reasoning that, because the true-life option did not exist at the time of defendant's crime, that option was not available in defendant's case in any circumstance under this court's collective decisions in *Langley I*. The trial court then applied the statute in effect at the time of defendant's crime, ORS 163.150 (1987), and instructed the jury that defendant must be sentenced either to death or to ordinary life. The jury answered the four statutory questions in the affirmative, and the trial court again sentenced defendant to death.

On direct review of the remand proceeding, defendant now argues that the trial court erred by refusing to allow him to waive his *ex post facto* objections to the true-life sentencing option set out in *former* ORS 163.150(5) (1993). He primarily relies upon *McDonnell*, 329 Or 375, in which this court held that a trial court erred by refusing to allow a defendant to waive his *ex post facto* objections to retroactive application of that statute. The state responds that, for various reasons, the rule set out in *McDonnell* either should not or cannot apply to this case.

We begin with the state's various preliminary contentions. The state first argues that the trial court lacked

---

[6] *Former* ORS 163.150(5) (1993) provided, in part:

"* * * Notwithstanding subsection (1)(a) of this section, the following shall apply:

"(a) If a reviewing court finds prejudicial error in the sentencing proceeding only, the court may set aside the sentence of death and remand the case to the trial court. * * * Upon remand and at the election of the state, the trial court shall either:

"(A) Sentence the defendant to imprisonment for life in the custody of the Department of Corrections as provided in ORS 163.105(1)(c); or

"(B) Impanel a new sentencing jury for the purpose of conducting a new sentencing proceeding to determine if the defendant should be sentenced to:

"(i) Death;

"(ii) Imprisonment for life without the possibility of release or parole as provided in ORS 163.105(1)(b); or

"(iii) Imprisonment for life in the custody of the Department of Corrections as provided in ORS 163.105(1)(c).

"* * * * *

"(e) The provisions of this section are procedural and shall apply to any defendant sentenced to death after December 6, 1984."

authority to instruct on the true-life sentencing option because that option was beyond the scope of this court's remand instructions in *Langley I* (on reconsideration). The state bases that argument upon its understanding that, in *Langley I* (on reconsideration), this court "unambiguously held that this defendant may not be sentenced to true life on remand." That characterization is inaccurate. *Langley I* (on reconsideration) merely recognized that defendant's constitutional protection against *ex post facto* laws, *if asserted*, would preclude the trial court from applying the true-life option retroactively. Nothing in the remand instructions precluded the trial court from accepting defendant's *waiver* of those constitutional rights on remand; indeed, waiver was not at issue in the *Langley I* proceedings.

■   Second, the state argues that the doctrine of "the law of the case" precludes application of the rule set out in *McDonnell*. The law of the case applies here, the state argues, because, "[w]hen this case previously was before this court, the court fully considered the issue and held (1) that the issue of potential sentences on remand properly was before it, and (2) that the true-life sentencing option was not among them."

■   Under the doctrine of the law of the case,

> "when a ruling or decision has been once made in a particular case by an appellate court, while it may be overruled in other cases, it is binding and conclusive both upon the inferior court in any further steps or proceedings in the same litigation and upon the appellate court itself in any subsequent appeal or other proceeding for review."

*State v. Pratt*, 316 Or 561, 569, 853 P2d 827 (1993) (internal quotation marks omitted). Thus, the law of the case "precludes relitigation or reconsideration of a point of law decided at an earlier stage of the same case." *Koch v. So. Pac. Transp. Co.*, 274 Or 499, 512, 547 P2d 589 (1976) (emphasis omitted).

In *Langley I*, the "point of law" at issue was whether retroactive application of the true-life sentencing option to defendant during his initial penalty-phase proceeding, to which defendant timely had objected, would violate constitutional *ex post facto* prohibitions. On reconsideration, this court concluded that it would. That point of law is not in dispute here. Rather, the question is whether defendant, on

remand, was entitled to *waive* his constitutional protections against *ex post facto* laws. Because that question was not presented or decided in the earlier proceeding, the doctrine of the law of the case does not prevent us from considering it now.

Finally, the state asserts that, during the *Langley I* proceeding, defendant did more than merely assert his *ex post facto* rights; rather, he made a separate, more general argument that the true-life sentencing option should not be provided to *any* jury in his case. Specifically, the state argues:

> "It is important to note the breadth of defendant's position: He did not state merely that application of the true-life sentencing option to him would violate *ex post facto* principles; rather, he insisted that he must be sentenced under the law as it existed at the time he committed his offense. The difference may be important, because the latter position does not leave room for an argument that, although the law is *ex post facto*, the *ex post facto* violation may be waived. In short, defendant's position was that under no circumstances could he be sentenced to true life."

In the state's view, defendant is bound by that argument here.

We disagree. Even if defendant had made such an argument in *Langley I*—a point with which we do not necessarily agree—such an argument would have no bearing upon our present review of the remand proceeding, particularly in light of the rule announced in *McDonnell*, discussed below.

■ We now apply the rule from *McDonnell* to determine whether remand is appropriate in this case. The defendant in *McDonnell*, who committed his crime in 1984, filed a waiver of all *ex post facto* objections to retroactive application of the true-life sentencing option at a remand proceeding that took place in 1993. The trial court refused to provide the true-life instruction in accordance with *former* ORS 163.150(5) (1993) and, instead, instructed the jury as to only the two sentencing options that were in effect in 1984—death and ordinary life. The defendant was sentenced to death. On review, this court concluded that the trial court had erred in refusing to

provide the true-life instruction, reasoning that the defendant was entitled to, and did, waive his constitutional protections against *ex post facto* laws. *McDonnell*, 329 Or at 390, 392.

Here, defendant argues that, as in *McDonnell*, he was entitled to the true-life instruction at his remand proceeding, even though that instruction was added by an amendment enacted after his crime. In *McDonnell*, this court concluded that, in enacting *former* ORS 163.150(5) (1993), the legislature intended the true-life sentencing option to be available in remand proceedings in which a defendant had been sentenced to death after December 6, 1984. Because defendant originally was sentenced to death in 1989, he falls within that class of defendants. We therefore conclude that the legislature intended the true-life option to be available in defendant's remand proceeding.

■ The final question is whether, given our conclusion that the legislature intended that *former* ORS 163.150(5) (1993) apply retroactively to defendant's case, defendant in fact waived any *ex post facto* objection. In *McDonnell*, this court concluded that the defendant's written waiver indicated that his decision not to invoke his constitutional protection against *ex post facto* laws constituted an intentional relinquishment of a known right. 329 Or at 389, 392; *see also State v. Rogers*, 330 Or 282, 291, 4 P3d 1261 (2000) (reaching same conclusion in similar circumstances). Similarly, defendant here intentionally decided not to invoke the protection of the state and federal *ex post facto* clauses, and submitted a written waiver to the court. We therefore conclude that defendant waived the protection afforded by those clauses.

The state argues, nonetheless, that this case is distinguishable from *McDonnell* in two ways. First, the state emphasizes that, in *McDonnell*, the state acquiesced in the defendant's request to apply the true-life sentencing option, whereas, in this case, the state consistently has objected to application of that option. This court rejected that same argument in *Rogers*, 330 Or at 291:

> "That the state objected to defendant's waiver in this case, whereas, in *McDonnell*, it did not, makes no difference to the result. As this court observed in *McDonnell*, the

'claim [that application of ORS 163.150(5) (1993) violated the prohibition against *ex post facto* laws] was defendant's to assert, and he did not do so.' 329 Or at 390. Any objection by the state to defendant's waiver of the protection of the *ex post facto* clauses has no effect. Because defendant did not invoke those constitutional protections in this case, he waived those protections."

(Brackets in original.) We reject the state's argument here for that same reason.

Second, the state argues that this case differs from *McDonnell* because the trial court in the *Langley I* proceeding instructed the jury on the true-life sentencing option and the jury nonetheless sentenced defendant to death. The state argues:

"Defendant's first jury, knowing that it had the option of sentencing defendant to ordinary life, true life, or death, chose the latter. In short, what defendant seeks here—an opportunity for a jury to consider the true-life sentencing option—he already has received. This court should not reverse defendant's death sentence simply to allow a second jury to consider the options that one jury already has considered."

Defendant counters that, although the jury in the *Langley I* proceeding was instructed on the true-life sentencing option, that jury received inadequate instructions on mitigating evidence. Defendant further points out that, although the jury in his remand proceeding received adequate instructions on mitigating evidence, it was not instructed properly on the true-life option. Defendant argues that he is entitled to a penalty-phase proceeding in which the jury properly is instructed in all respects.

We agree with defendant. A properly instructed jury, that is, a jury properly instructed both on the true-life sentencing option and on mitigating evidence, could have returned a verdict supporting a sentence other than death. We reject the state's contrary argument.

In sum, we conclude that we must vacate defendant's sentence of death and remand the case for further proceedings. *See Rogers*, 330 Or at 291-92 (reaching same conclusion and disposition); *McDonnell*, 329 Or at 392 (same).

Defendant raises two additional assignments of error that are likely to arise on remand, which we address below. *See, e.g., Rogers*, 330 Or at 292 (following that methodology).

## PRIVILEGED COMMUNICATIONS

Defendant contends that certain evidence was admitted at his remand proceeding in violation of the psychotherapist-patient privilege set out in OEC 504(2). Specifically, defendant objects to the admission of five exhibits and the testimony of eight witnesses (discussed in further detail below), the substance of which, to some extent, either pertained or referred to defendant's participation in the CTP at the Oregon State Hospital. In defendant's view, the substance of all the evidence at issue constituted privileged communications under OEC 504, which provides, in part:

"(1)   * * * As used in this section, unless the context requires otherwise:

"(a)   'Confidential communication' means a communication not intended to be disclosed to third persons except:

"* * * * *

"(C)   Persons who are participating in the diagnosis and treatment under the direction of the psychotherapist, including members of the patient's family.

"(b)   'Patient' means a person who consults or is examined or interviewed by a psychotherapist.

"* * * * *

"(2)   * * * A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purposes of diagnosis or treatment of the patient's mental or emotional condition among the patient, the patient's psychotherapist or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family."[7]

---

[7] In respect of defendant's challenge to all the communications at issue, we note that neither party has questioned whether the psychotherapist-patient privilege applies when the relationship itself is imposed by the state. As have the parties, we proceed on the assumption that it does.

Defendant further contends that the admission of the evidence at issue violated his right to privacy under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[8]

In response, the state contends, among other things, that: (1) this court previously held in *Langley I*, 314 Or at 265-67, that defendant had waived his psychotherapist-patient privilege as to some of the communications at issue and, therefore, that particular evidence and other related evidence now is admissible as the law of the case; (2) much of the challenged evidence was not privileged in any event under OEC 504; and (3) defendant's constitutional privacy argument is without merit.

■ We begin with the challenged exhibits and the state's argument that this court's decision in *Langley I* controls our determination of the evidentiary issue before us now. In *Langley I*, this court addressed the admissibility of three of the five exhibits at issue here, all of which arose from defendant's participation in the CTP: (1) a "treatment contract" (exhibit 1140); (2) a "self-assessment" (exhibit 1141); and (3) a 13-page "life history" (exhibit 1297). 314 Or at 262. The court first determined that the psychotherapist-patient privilege set out in OEC 504(2) applied to each of those three exhibits. *Id.* at 263-64. The court then concluded, however, that, because exhibits 1140 and 1141 previously had been admitted during the Rockenbrant trial, defendant had waived his privilege as to those exhibits under OEC 511, which provides, in part:

> "A person upon whom * * * Rules 503 to 514 * * * confer a privilege against disclosure of the confidential matter or communication waives the privilege if the person * * * voluntarily discloses or consents to disclosure of any significant part of the matter or communication. * * *"

(Brackets omitted.); *Langley I*, 314 Or at 264-65. Finally, the court reviewed the contents of exhibit 1297 and concluded that, under OEC 511, that exhibit disclosed a "significant

---

[8] The Fourteenth Amendment to the United States Constitution provides, in part: "No State shall * * * deprive any person of life, liberty, or property, without due process of law."

part" of the communications contained in exhibits 1140 and 1141 because "[t]he subject matter of all [the] documents was the mental or emotional problems underlying defendant's tendency to commit crimes." *Langley I*, 314 Or at 266. Accordingly, the court concluded that, as with exhibits 1140 and 1141, defendant had waived his privilege in respect of exhibit 1297. *Id.*

■ Defendant argues that, as to those three exhibits, *Langley I* should not be deemed controlling because he personally and affirmatively had not waived his privilege during the Rockenbrant trial. This court rejected defendant's similar argument in *Langley I*, noting that defense counsel in the Rockenbrant trial took time to review exhibits 1140 and 1141, and thereafter did not object to their admission. *Id.* at 265 n 14. We again reject defendant's argument for that reason. *See Pratt*, 316 Or at 569 (under doctrine of law of the case, earlier appellate court decision is binding and conclusive in subsequent proceedings involving same issue in same case); *see also Goldsborough v. Eagle Crest Partners, Ltd.*, 314 Or 336, 342, 838 P2d 1069 (1992) (in absence of evidence to contrary, court can infer that lawyer who voluntarily turns over privileged material during discovery acts within scope of authority from client and with client's consent); *Groff v. S.I.A.C.*, 246 Or 557, 566-67, 426 P2d 738 (1967) (noting that statutory privilege can be waived when holder of privilege offered evidence at issue during her case-in-chief or otherwise without objection). Accordingly, we hold that the trial court did not err in admitting exhibits 1140, 1141, and 1297 into evidence during the remand proceeding.[9]

---

[9] Defendant contends that the doctrine of "the law of the case" should not apply here because he produced new evidence below demonstrating that he personally had not waived his privilege in respect of exhibits 1140 and 1141 during the Rockenbrant trial. Defendant is correct that, as a general matter, the doctrine of the law of the case is inapplicable in light of new facts or evidence bearing on the legal issue in question. *See Huszar v. Certified Realty Co.*, 272 Or 517, 523, 538 P2d 57 (1975) (doctrine inapplicable where parties produce further evidence); *Peltier v. Dahlke*, 256 Or 84, 88-89, 471 P2d 434 (1970) (application of doctrine turns upon whether evidence offered at subsequent proceeding "substantially the same" as earlier evidence). However, defendant points to no part of the record—and we have found none—that supports his contention that he introduced further evidence establishing that he did not personally waive his privilege during the Rockenbrant trial.

Defendant also challenges the admission of exhibit 1104, which sets out a record of defendant's requests for off-premises passes, as well as his check-in and check-out records. Although it is unclear from the record before us whether exhibit 1104, like exhibits 1140 and 1141, was admitted during the Rockenbrant trial, we have reviewed the record from the *Langley I* proceedings and have determined that that exhibit was admitted, without objection,[10] during the guilt phase. Consequently, even assuming (without deciding) that exhibit 1104 disclosed privileged communications under OEC 504, we conclude, for the same reasoning set out in *Langley I*, 314 Or at 264-65, that defendant waived his privilege in respect of that exhibit.

■ We turn to exhibit 1379, which consists of the following materials relating to defendant's stay at the CTP: a face sheet summarizing defendant's medical record; a list of the reasons for defendant's admission to the CTP and his progress while in attendance; a psychological evaluation; a comprehensive list of chart notes dating from August 1987 to April 1988 that summarize defendant's off-premises passes, check-in and check-out records, interaction with staff, and weekly progress updates; a psychological diagnosis update; information concerning defendant's identified mental and emotional problems, and his treatment plan; progress records; and a security-action sheet. As with exhibits 1140, 1141, 1297, and 1104, defendant contends that exhibit 1379 consists of privileged communications under OEC 504(2) that should not have been admitted at trial. The state responds that, as with the other exhibits, defendant waived his privilege.

As noted, in *Langley I*, this court concluded that defendant had waived his privilege in respect of exhibits 1140 and 1141, the subject matter of which was defendant's "mental or emotional problems underlying [his] tendency to commit crimes." 314 Or at 266. Under OEC 511, a waiver occurs when the holder of the privilege "voluntarily discloses

---

[10] We note that, during the *Langley I* proceedings, defense counsel initially objected to parts of exhibit 1104 upon relevance and prejudice grounds, but never upon privilege grounds. The state redacted the objectionable parts of the exhibit after conferring with defense counsel. That redacted exhibit appears to be the same as the exhibit at issue here.

or consents to disclosure of *any significant part* of the matter or communication." (Emphasis added.) Like exhibits 1140, 1141, and 1297, a "significant part" of the material contained in exhibit 1379 relates to the mental and emotional problems underlying defendant's tendency to commit crimes—in addition to other information concerning his treatment goals, progress, and a record of his leaving and returning to the CTP. Similarly, parts of exhibit 1379 duplicate much of the information contained in exhibit 1104, regarding defendant's off-premises pass requests and check-in and check-out records. Because a "significant part" of the substance of exhibit 1379 previously was admitted without objection during both the Rockenbrant trial and the *Langley I* proceedings, we hold, under the same reasoning set out in *Langley I*, 314 Or at 264-65, in respect of exhibit 1297, that defendant has waived his privilege as to the content of exhibit 1379.

In addition to the five exhibits discussed above, defendant contends that the trial court erred in admitting the testimony of eight witnesses, upon the ground that each witness testified as to confidential communication protected by the psychotherapist-patient privilege. The state responds that the objectionable subject matter of each witness's testimony fell within the scope of defendant's waiver discussed in *Langley I* and, accordingly, that testimony must be deemed admissible under the law of the case. Alternatively, the state argues that much of the testimony at issue did not involve privileged communications.

For seven of the eight witnesses at issue,[11] we need not determine whether their testimony disclosed privileged communications under OEC 504 or whether that testimony fell within the scope of defendant's waiver under OEC 511 concerning the exhibits at issue in *Langley I*. That is so, because those seven witnesses all testified without objection[12] during either the guilt or penalty phase of defendant's

---

[11] Those seven witnesses were: Sampson (CTP program coordinator and provider of after-care treatment); Romany (CTP therapy supervisor); Northcott (CTP security director); Briggs (CTP night-shift security aide); McEvoy (CTP night-shift security aide); Layton (former inmate and CTP participant); and Gowin (former inmate and CTP participant).

[12] We note that, in a few isolated instances, defense counsel in the *Langley I* proceedings did object during the course of certain witnesses' testimony; however,

trial in *Langley I.* We have reviewed the records from both that proceeding and defendant's remand proceeding, and have concluded that each witness's testimony, to the extent that it arguably disclosed any privileged communications, conveyed essentially the same information in both proceedings.[13] Accordingly, we conclude that, consistent with the analysis in *Langley I,* 314 Or at 264-65, 265 n 14, concerning defendant's waiver of the privilege during the Rockenbrant trial, defendant similarly waived his privilege in respect of the communications disclosed in the testimony of those seven witnesses.

As to the eighth witness, Ulven, we conclude that her testimony did not disclose any privileged communication. Ulven, who is defendant's second cousin, testified about a number of conversations that she had had with defendant while he was on family visits approved by CTP staff. In those conversations, which took place off the state hospital grounds, defendant told Ulven about his criminal record and his plans for the future. Nothing in the record demonstrates that Ulven was "participating in the diagnosis and treatment" of defendant "under the direction of [a] psychotherapist," OEC 504(1)(a)(C), or that the communications were made "for the purposes of diagnosis or treatment of [defendant]'s mental or emotional condition," OEC 504(2). In short, defendant's conversations with Ulven simply do not fit within the definition of "confidential communication" set out in OEC 504.

---

such objections were not based upon the psychotherapist-patient privilege. We further note that one of the witnesses at issue, Samson, was called by the defense, as well as the state, during the *Langley I* proceedings, and testified in that regard as to some of the communications at issue.

[13] We note that the testimony of Layton, a former inmate and CTP participant, during the remand proceeding, conveyed some additional information that his testimony during the *Langley I* proceedings did not convey. Specifically, Layton testified about defendant's somewhat suspicious acquisition of a vehicle about the time when Rockenbrant was murdered, as well as two isolated incidents in which defendant had displayed aggression toward Layton while participating in the CTP. However, to the extent that that new testimony arguably disclosed any privileged communications under OEC 504, certain testimony of other witnesses during the *Langley I* proceedings — specifically, Romany (CTP therapy supervisor) and Briggs (CTP night-shift security aide) — disclosed a "significant part," OEC 511, of Layton's new testimony during the remand proceeding.

Defendant next contends that, in respect of all the challenged exhibits and testimony, an initial violation of the psychotherapist-patient privilege occurred when police investigators seized various CTP documents and interviewed CTP staff and inmate participants, following the discovery of the bodies of Rockenbrant and Gray, thereby obtaining information concerning defendant's privileged communications and actions while a patient at the CTP. Defendant continues that a similar violation of the privilege occurred when CTP staff and inmate participants testified before the grand jury that ultimately indicted defendant on multiple counts of aggravated murder. In defendant's view, those initial disclosures—of which he was unaware and to which he did not consent—dictate that subsequent references to the same privileged communications should have been deemed inadmissible at his remand proceeding.

Assuming, without deciding, that CTP staff violated defendant's psychotherapist-patient privilege when they spoke to investigators and testified before the grand jury, we disagree that such facts preclude the conclusion that defendant nonetheless voluntarily waived the privilege at a later time, specifically, during the Rockenbrant trial and the *Langley I* proceedings. At the outset, we note the well-settled principle that a privilege pertaining to confidential communications terminates upon the holder's voluntary waiver:

> " 'Briefly, a privilege is lost when the reason for it ceases to apply. As the commentary to Federal Rule 511 explains:
>
>> " ' "The central purpose of most privileges is the promotion of some interest or relationship by endowing it with a supporting secrecy or confidentiality. *It is evident that the privilege should terminate when the holder by [the holder's] own act destroys this confidentiality.* McCormick, *Evidence* §§ 93, 103 (2d ed 1972); 8 Wigmore, *Evidence* §§ 2242, 2327-2329, 2374, 2389-2390 (McNaughton rev 1961).
>>
>> " ' "* * * * * *
>>
>> " ' "By traditional doctrine, waiver is the intentional relinquishment of a known right. *Johnson v. Zerbst,* 304

US 458, 464, 58 S Ct 1019, 82 L Ed 1461 (1938). How-ever, in the confidential privilege situations, *once confi-dentiality is destroyed through voluntary disclosure, no subsequent claim of privilege can restore it,* and knowl-edge or lack of knowledge of the existence of the privi-lege appears to be irrelevant. California Evidence Code § 912; Wigmore § 2327." ' "

*Goldsborough,* 314 Or at 341 (quoting Commentary to OEC 511, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence,* 282-83 (2d ed 1989)) (emphasis added).

It follows from the foregoing that a voluntary waiver by the holder of a privilege to confidential communications can operate to terminate that privilege, notwithstanding that another participant in the communications might have vio-lated the privilege at an earlier time without the holder's knowledge or consent. Accordingly, we conclude that defen-dant's waiver of his psychotherapist-patient privilege during the Rockenbrant trial and the *Langley I* proceedings as to the exhibits and testimony at issue operated to terminate that privilege, notwithstanding possible earlier violations of the privilege by CTP staff and inmate participants. *Compare State v. Miller,* 300 Or 203, 709 P2d 225 (1985) (state-employed psychotherapist's unauthorized disclosure of privi-leged communications to police deemed inadmissible in sub-sequent prosecution of criminal defendant; waiver not at issue).

■ Defendant next contends that, in disclosing privi-leged information to police investigators and the grand jury, CTP staff violated his right to privacy under the Fourteenth Amendment to the United States Constitution. We agree with defendant that, at the least, his constitutional right to privacy might have been implicated by those disclosures.[14] As

---

[14] We note that, in *Miller,* 300 Or at 220 n 10, this court rejected a similar con-tention that an unauthorized disclosure of privileged information by a state-employed psychotherapist violated the defendant's right to privacy under the Four-teenth Amendment. The *Miller* court relied upon *Whalen v. Roe,* 429 US 589, 97 S Ct 869, 51 L Ed 2d 64 (1977), for the proposition that the United States Supreme Court had rejected the notion that the doctor-patient relationship falls within a constitutional zone of privacy. *Miller,* 300 Or at 220 n 10.

In *Whalen,* 429 US 589, the Supreme Court upheld a state statute that required physicians to report their patients' prescriptions for certain controlled substances to the state, in light of strict statutory safeguards protecting against

explained below, however, we need not make that determination here, because we conclude that defendant waived any protection afforded to him under the Fourteenth Amendment.

As explained earlier, defendant's failure to object to the admission of certain exhibits and testimony during the Rockenbrant trial and the *Langley I* proceedings constituted a voluntary waiver of his psychotherapist-patient privilege under OEC 511. *See* 331 Or at 442, 447 (under OEC 511, holder can waive privilege by voluntarily disclosing or consenting to disclosure of any significant part of communications; holder need not be aware of existence of privilege to waive it). In criminal cases involving constitutional rights, a waiver ordinarily is treated as "an intentional relinquishment or abandonment of a known right or privilege." *Johnson*, 304 US at 464. However, the Supreme Court recently has noted that, in certain circumstances, the test for determining whether such a waiver has occurred can be a flexible one:

> "What suffices for waiver depends on the nature of the right at issue. '[W]hether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on

---

unwarranted disclosure. Upon further review of *Whalen*, we agree with defendant that that case does not preclude the conclusion that information conveyed to a psychotherapist during the course of the psychotherapist-patient relationship could fall within the privacy interests protected by the Fourteenth Amendment. Indeed, in *Whalen*, the Supreme Court stated that one type of privacy so protected is "the individual interest in avoiding disclosure of personal matters." *Whalen*, 429 US at 599. Following *Whalen*, a number of courts have held that medical information falls within that protection, *see Doe v. City of New York*, 15 F3d 264, 267 (2d Cir 1994) ("the right to confidentiality includes the right to protection regarding information about the state of one's health"); *United States v. Westinghouse Elec. Corp.*, 638 F2d 570, 577 (3d Cir 1980) (to same effect), and some specifically have held that the psychotherapist-patient relationship also falls within that protection, *see Hawaii Psychiatric Soc., Dist. Branch v. Ariyoshi*, 481 F Supp 1028, 1038 (D HI 1979) (right to choose confidentiality "particularly crucial" in context of psychotherapist-patient communications); *Hirschfeld v. Stone*, 193 FRD 175, 185-86 (SD NY 2000) (disclosure of incarcerated criminal defendants' psychiatric and medical information deemed to be invasion of constitutional right to privacy). *See also generally Jaffee v. Redmond*, 518 US 1, 11, 116 S Ct 1923, 135 L Ed 2d 337 (1996) (in concluding that psychotherapist-patient communications fall within federal evidentiary privilege, Supreme Court noted that protection of such communications from involuntarily disclosure "serves important private interests").

the right at stake.' *United States v. Olano*, 507 US 725, 733 (1993). For certain fundamental rights, the defendant must personally make an informed waiver. See, *e.g.*, *Johnson* \* \* \*, 304 US [at] 464-65 \* \* \* (right to counsel); *Brookhart v. Janis*, 384 US 1, 7-8 (1966) (right to plead not guilty). For other rights, however, waiver may be effected by action of counsel. 'Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has—and must have—full authority to manage the conduct of the trial.' *Taylor v. Illinois*, 484 US 400 (1988). \* \* \* Thus, decisions by counsel are generally given effect as to what arguments to pursue, see *Jones v. Barnes*, 463 US 745 (1983) [and] what evidentiary objections to raise, see *Henry v. Mississippi*, 379 US 443, 451 (1965) \* \* \*. Absent a demonstration of ineffectiveness, counsel's word on such matters is the last."

*New York v. Hill*, 528 US 110, 120 S Ct 659, 664, 145 L Ed 2d 560 (2000). *See also Taylor*, 484 US at 418 ("Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision to forgo cross-examination [or] to decide not to put certain witnesses on the stand \* \* \*.").

■     The foregoing statements from the Supreme Court demonstrate that a criminal defendant personally need not waive certain federal constitutional protections. Rather, absent a demonstration that counsel was ineffective, or some other affirmative showing that no waiver in fact occurred, a defendant can be deemed to have consented voluntarily to certain actions of defense counsel, such as the failure to object to certain evidence. *Compare Taylor*, 484 US at 418 (notwithstanding Compulsory Process Clause of Sixth Amendment, client bound by defense counsel's decision to withhold identity of witness, resulting in trial court's refusal to hear witness's testimony), *with Henry*, 379 US at 451 n 7 (no waiver where defense counsel briefly broached subject of certain evidence only after moving for directed verdict upon ground that evidence obtained illegally).

In this case, defense counsel did not object to any of the evidence at issue upon privacy grounds during the

*Langley I* proceedings. Accordingly, we conclude that defendant waived any privacy protection afforded to him under the Fourteenth Amendment.[15]

## ACCOMPLICE INSTRUCTIONS

Defendant contends that the trial court erred in refusing to give five requested jury instructions concerning accomplice testimony, in connection with the testimony of Thayer, who was defendant's girlfriend at the time of Gray's murder. The requested instructions: (1) defined the term "accomplice witness"; (2) stated that defendant had the burden of proving by a preponderance of the evidence that a witness was an accomplice witness; (3) explained the preponderance-of-the-evidence standard; (4) stated that, if the jury found Thayer to be an accomplice witness, then it should view her testimony with distrust; and (5) defined the terms "aid[ ]" and "abet[ ]." The trial court refused to give those instructions, reasoning that they were not relevant to the penalty phase of defendant's trial.

Defendant argues that the trial court should have instructed the jury that it could consider whether Thayer was an accomplice in Gray's murder and, if it so found, that the jury should view her testimony with distrust. In defendant's view, such instructions would have served a mitigating purpose, because, so instructed, the jury might have determined that defendant should not be sentenced to death if it thought that Thayer also was involved in Gray's murder. The state responds alternatively that: (1) as the trial court concluded, the instructions at issue are not applicable during a penalty-phase proceeding; and (2) in any event, defendant failed to present any evidence that tended to prove that Thayer had acted as an accomplice.

---

[15] Defendant also contends that, because the state violated his right to privacy, any additional information obtained from CTP staff and inmate participants was inadmissible as fruit of the poisonous tree. We need not address that argument, in light of our conclusion that defendant waived any right to privacy that might have been implicated.

Finally, defendant contends that the state should be estopped from prosecuting him using evidence obtained in violation of his psychotherapist-patient privilege and right to privacy. However, defendant did not make that argument in the trial court; therefore, we do not address it.

■   This court reviews a trial court's refusal to give a requested jury instruction for error as a matter of law. *State v. Moore*, 324 Or 396, 427, 927 P2d 1073 (1996). For the reasons explained below, we conclude that the trial court did not err in refusing to give defendant's requested accomplice instructions in the remand proceeding.

■   The issue of accomplice testimony generally arises under the corroboration requirement of ORS 136.440, which provides, in part:

> "(1)   A *conviction* cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence that tends to connect the defendant with the commission of the offense. * * *
>
> "(2)   As used in this section, an 'accomplice' means a witness in a criminal action who, according to the evidence adduced in the action, is criminally liable for the conduct of the defendant under ORS 161.155 and 161.165[.]"[16]

(Emphasis added.) In light of that corroboration requirement, juries are to be instructed, "on all proper occasions," that "the testimony of an accomplice ought to be viewed with distrust." ORS 10.095(4); *see also State v. Simson*, 308 Or 102, 110, 775 P2d 837 (1989) (purpose of corroboration requirement and accompanying accomplice instructions is to

---

[16] ORS 161.155 provides:

"A person is criminally liable for the conduct of another person constituting a crime if:

"(1)   The person is made criminally liable by the statute defining the crime; or

"(2)   With the intent to promote or facilitate the commission of the crime the person:

"(a)   Solicits or commands such other person to commit the crime; or

"(b)   Aids or abets or agrees or attempts to aid or abet such other person in planning or committing the crime; or

"(c)   Having a legal duty to prevent the commission of the crime, fails to make an effort the person is legally required to make."

ORS 161.165 provides:

"Except as otherwise provided by the statute defining the crime, a person is not criminally liable for conduct of another constituting a crime if:

"(1)   The person is a victim of that crime; or

"(2)   The crime is so defined that the conduct of the person is necessarily incidental thereto."

highlight fact that "criminals may falsely accuse others of their misdeeds in order to minimize their own culpability").

The corroboration requirement for accomplice testimony in ORS 136.440(1) is a predicate for entry of a *conviction*. That is, if the evidence includes the testimony of an accomplice, then the court cannot enter a conviction unless the record also contains other evidence that corroborates the accomplice's testimony in the manner stated in ORS 136.440(1).

In a trial for aggravated murder, the jury addresses the issue of the defendant's guilt or innocence during the guilt phase. If the jury determines that the defendant is guilty of aggravated murder, then the trial proceeds to the penalty phase. However, the jury does not address, during the penalty phase, the question whether the defendant committed the charged crime. Instead, the jury determines the appropriate penalty for the crime for which the jury found the defendant guilty during the guilt phase. *See* ORS 163.150(1)(a) (contrasting guilt phase with penalty phase).

In short, within the structure of a trial for aggravated murder, only during the guilt phase does the jury decide whether to "convict" the defendant. That supports the conclusion that the corroboration requirement set out in ORS 136.440(1) applies only during the guilt phase. The requirement in that statute that corroborative evidence must "tend[ ] to connect the defendant with the commission of the offense" also reinforces our view that the corroboration requirement pertains only to the guilt phase of a trial for aggravated murder. That is the only plausible interpretation that we can draw from the statutory text and context of ORS 136.440(1). *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993) (if statutory meaning is clear from examination of text and context, further inquiry is unnecessary).

From the foregoing, we conclude that ORS 136.440(1) did not entitle defendant to jury instructions regarding the corroboration requirement for accomplice testimony during his remand proceeding, which pertained only to the ascertainment of the proper penalty for aggravated murder. The

trial court therefore did not err in refusing to give defendant's requested instructions.[17]

### REMAINING ASSIGNMENTS OF ERROR

We have considered defendant's remaining assignments of error and have concluded that they involve either issues that this court previously has decided in the state's favor or are not likely to arise on remand, or arguments that are not developed or are without merit.

### CONCLUSION

In summary, we conclude that the trial court erred when it refused to permit defendant to waive any *ex post facto* objection to retroactive application of the true-life sentencing option set out in *former* ORS 163.150(5) (1993) and when it refused to instruct the jury on that option. That error requires us to vacate the sentence of death and remand the case for further proceedings. We further conclude that the trial court did not err in admitting evidence that defendant contends was subject to a psychotherapist-patient privilege under OEC 504, as well as a constitutional right to privacy under the Fourteenth Amendment. Finally, we conclude that the trial court did not err in refusing to give defendant's requested jury instructions on accomplice testimony.

The sentence of death is vacated, and the case is remanded to the circuit court for further proceedings.

---

[17] In this assignment of error, defendant also contends that the trial court's refusal to give his requested instructions prevented the jury from considering mitigating evidence; at trial, defendant cited *Penry v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989), to support that proposition. However, the trial court's proper refusal to give the requested instructions did not preclude defendant from arguing to the jury his theory that Thayer's testimony was not credible because she might have been involved in Gray's murder. Further, the trial court properly instructed the jury on mitigating evidence under the fourth question currently set out in ORS 163.150(b)(D). *See Moore*, 324 Or at 432 (fourth question enacted to comply with *Penry*, concerning effect of Eighth Amendment upon state's ability to narrow jury discretion in considering mitigating evidence); *Wagner*, 309 Or at 18 (clarifying fourth question). For those reasons, we reject defendant's argument.