Argued and submitted June 28, 2005, vacated and remanded January 18, 2006

# FRANK EDWARD GABLE,
*Appellant,*

*v.*

# STATE OF OREGON,
*Respondent.*

## 95C-12041; A113425

126 P3d 739

David J. Celuch argued the cause and filed the brief for appellant.

Carolyn Alexander, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Ortega, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Petitioner was convicted in 1991 on six counts of aggravated murder and one count of murder and sentenced to life imprisonment without the possibility of parole. His conviction and sentence were affirmed on direct appeal. *State v. Gable*, 127 Or App 320, 873 P2d 351, *rev den*, 319 Or 274 (1994). He filed a petition for post-conviction relief in 1995, and the post-conviction trial was held in May 2000. The post-conviction court denied relief, making extensive findings of fact and conclusions of law. On appeal, petitioner contends that the post-conviction court erred in denying relief, raising six assignments of error. As explained below, we reject all but one of petitioner's assignments and remand for further proceedings.

■ On appeal, we are bound by the post-conviction court's factual findings to the extent that they are supported by evidence in the record. *Cunningham v. Thompson*, 186 Or App 221, 226, 62 P3d 823, *adh'd to as modified on recons*, 188 Or App 289, 71 P3d 110 (2003), *rev den*, 337 Or 327 (2004). The facts pertinent to our disposition of this appeal are drawn from the post-conviction court's extensive factual findings and are supported by evidence in the record.

Shortly after midnight on January 18, 1989, Michael Francke, the Director of the Oregon Department of Corrections, was found stabbed to death outside the administrative offices of the Department of Corrections at the Dome Building in Salem. Francke was last seen alive by coworkers at about 6:45 p.m. on January 17 at the Dome Building shortly after a meeting ended.

Cappie "Shorty" Harden, an acquaintance of petitioner, testified that, between 6:30 and 7:00 p.m. on January 17, he went to the parking lot of the Dome Building to pick up Jodie Swearingen. He saw a light come on in a car in the lot and recognized petitioner getting into the car. According to Harden, a man approached the car and yelled, "Hey, what are you doing in my car?" Petitioner then got out of the car and stabbed the man in the chest. Harden further testified that he had seen petitioner earlier that day carrying a knife in his waistband.

Swearingen testified that she was not on the grounds of the Dome Building at the time of the murder, did not see petitioner burglarizing Francke's car, and did not witness the murder. On cross-examination, she admitted that she had previously told a number of individuals, as well as the Marion County Grand Jury, that she and Harden had seen petitioner murder Francke. Earle Childers, another acquaintance of petitioner, testified that he also saw petitioner near the Dome Building between 6:30 and 7:00 p.m. on January 17.

Between 7:02 and 7:05 p.m., a maintenance worker left the Dome Building and, as he walked toward the parking lot, heard a grunting sound, as if "somebody had their breath knocked out." He saw two men facing each other and saw one man turn and walk up the steps to the Dome Building while the other man ran in the opposite direction and crossed the street. The maintenance worker's description of the man who ran and crossed the street matched petitioner.

At approximately 7:15 p.m., two workers who were leaving the Dome Building saw that the dome light was on in Francke's car, which was parked in his parking space outside the Dome Building, and that the driver's door was open. They closed the car door, checked Francke's office and found it dark, and tried to page Francke but received no answer. They then alerted security. A security guard checked the area shortly thereafter but found nothing. The guard did not check the North Portico area of the Dome Building. Two other corrections officials were notified and also checked the area at approximately 8:20 p.m.; they also found nothing, but, like the security guard, they did not check the North Portico area.

Between 8:30 and 10:30 p.m., petitioner went to Mark Gesner's residence and asked him to get rid of something for him. Petitioner gave Gesner a large plastic bag tied at the top. Gesner took the bag to the Willamette River, put rocks inside it, and threw it in. He believed that the bag contained some type of cloth as well as a cylindrical object.

Shortly after midnight in the early hours of January 18, a security guard discovered Francke's body on the North Portico of the Dome Building. Francke had been stabbed.

Francke's blood was found on the sidewalk leading to the North Portico as well as on the stairs. Analysis of the pattern of bloodstains and other evidence indicated that Francke, after being stabbed, had moved up the stairs from the sidewalk and attempted to enter the Dome Building through the North Portico. However, the North Portico door was malfunctioning, and Francke died outside that door. There were no signs of a struggle.

On the morning of January 18, petitioner told Linda Perkins that he "fucked up big time this time" and that she would "be reading about it in the papers." That evening, petitioner, in the course of conducting a drug deal and discussing the Francke murder with John Kevin Walker, told Walker that "I stuck him." Petitioner then told Walker, "Don't tell on me, Kevin, or I'll have to kill you and kill your family."

Soon after the murder, petitioner told Childers to forget that he had seen petitioner on the day of the murder. Several months later, petitioner told Childers that he had been burglarizing Francke's car, had been caught by Francke, and had struck him because petitioner, who was on parole, did not want to go back to prison.

Several months after the murder, petitioner also told David Walsh that a particular knife was the one that petitioner had used to kill Francke. Petitioner stated that he had been "jockey-boxing" the car when Francke had approached and that petitioner had stabbed Francke repeatedly. Petitioner told Walsh that, if he said anything, petitioner would kill him and his family.

Petitioner talked to various police officers in various contexts in the summer and fall of 1989, both before and after he became a suspect in the Francke murder. Petitioner stated on several occasions that he had been at the Dome Building on the day of the murder; once, petitioner said that he wanted to talk about the investigation with state police. In September 1989, petitioner was questioned specifically about the murder by Oregon State Police officers. Petitioner suggested that he thought he was being questioned because he had jokingly told his wife that he had killed Francke—and that, if he had killed Francke, it would make him a big man in prison. Petitioner spoke with one of the same officers the next day and stated that he did not kill Francke. In the same

conversation, however, petitioner also told the officer that part of his brain was telling him, "you did it," but he knew he did not do it. He later added, "Well, then there are only two people who know Francke—yeah, me and God."

In April 1990, petitioner was indicted for the Francke murder and charged with six counts of aggravated murder and one count of murder. After petitioner was arrested, an officer told him that a witness had placed him at the scene, and petitioner responded, "Oh, Earle told you that, didn't he?" Later the same day, when another officer told petitioner, "we got the killer sitting right here," petitioner replied, "Maybe so, maybe not." When asked, "You're going to take this to the grave with you, aren't you?" petitioner replied, "You bet I am." The following day, petitioner told another officer, "I might have been driving by that night and Jodie and Shorty saw me."

In March 1991, petitioner's criminal trial began. Petitioner's criminal defense counsel were Robert Abel and John Storkel. On March 31, 1991, petitioner sent a letter to the trial court in which he complained about his lawyers and indicated that he wanted a continuance. The court informed petitioner that he needed to work through his lawyers for matters such as requests for continuance. The guilt phase of petitioner's trial, which was the subject of intense public interest, occurred over two months. On June 27, 1991, the jury returned its verdict, finding petitioner guilty on all counts.

On July 1, shortly before the penalty phase of the trial began, petitioner sent another letter to the trial court. The court had a brief discussion on the record with petitioner concerning that letter. The court decided that the letter should be made part of the record but sealed until after the penalty phase was completed. In that letter, petitioner complained that his attorneys were not professionally competent and, particularly, that they had failed to prepare him to testify, had failed to examine and cross-examine witnesses effectively, and had failed to obtain adequate discovery. Petitioner further asserted that he had smelled alcohol on Abel's breath "numerous times."

The penalty phase of the trial began on July 2, 1991. The jury, at the request of defense counsel, was instructed on

three sentencing options: the death penalty, life imprisonment without possibility of parole ("true life"), and life imprisonment with possibility of parole. On July 11, 1991, the jury concluded its deliberations and determined that petitioner should not be subjected to the death penalty, but also should not ever be eligible for parole. The trial court thereafter sentenced petitioner to life imprisonment without the possibility of parole. As noted above, petitioner's convictions and sentence were affirmed on direct appeal.

As pertinent to this appeal, petitioner alleged in his petition for post-conviction relief that he was denied adequate assistance of trial counsel in violation of Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution because counsel (1) failed to investigate or adduce evidence at trial that Timothy Natividad committed the murder, (2) failed to allow petitioner to testify on his own behalf, and (3) failed to object on *ex post facto* grounds to the availability of a sentence of life imprisonment without the possibility of parole. Petitioner further contended that the criminal trial court denied him the right to be heard conferred by Article I, sections 10 and 11, of the Oregon Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution by failing to respond adequately to, and provide relief requested in, petitioner's two letters to the court presented during trial complaining about defense counsel.

During the post-conviction trial, petitioner asked the court to send Francke's clothing and fingernail scrapings to a laboratory for DNA testing, giving the parties leave to reopen the proceedings if the DNA results warranted further action.[1] At the end of the trial, the court granted that request. Petitioner's counsel sent numerous items, including a strand of long hair that had been found on Francke's clothing. The laboratory found the hair not to be suitable for polymerase chain reaction (PCR) DNA testing, and petitioner's counsel sought funds from the court to have additional tests performed. The court granted that motion. The laboratory that had done the testing, however, apparently refused to release the hair due

---

[1] It is not apparent which, if any, of petitioner's claims for relief served as the basis for that request.

to some dispute about payment of its bills. After the post-conviction court rendered its judgment determining petitioner's claims for relief, as described below, petitioner moved that the judgment be set aside and the proceedings reopened pending the outcome of further testing. The court denied that motion.

The post-conviction court rendered a 104-page judgment that rejected each of petitioner's claims for relief, including his 14 specifications of alleged inadequate assistance of trial counsel. That judgment included comprehensive—indeed, exhaustive—findings of fact and conclusions of law with respect to each of petitioner's claims and ancillary specifications. Petitioner then filed this appeal, raising six assignments of error. We address each of them.

Petitioner first argues that the post-conviction court erred in rejecting his claim that his criminal defense counsel had failed to sufficiently pursue the so-called "Natividad theory."[2] The post-conviction court made extensive findings concerning the "Natividad theory," and those findings are supported by the evidence in the record. A recitation of those factual findings would be of no benefit to the bench, the bar, or the public. Suffice it to say that those findings support the post-conviction court's ultimate conclusion that the "Natividad theory" was "pursued and beaten to death at trial, and although truly having no life beyond speculation and conjecture, even at this point [it is] continuing to be beaten on in these post-conviction proceedings to little avail." Accordingly, we affirm, without further discussion, the post-conviction court's disposition of that matter.

Petitioner also argues that he received inadequate assistance of trial counsel because counsel "deprived him of the opportunity to testify." Again, the post-conviction court made comprehensive factual findings regarding that matter. We summarize those findings, which are supported by evidence in the record.

Before trial began, neither petitioner nor his attorneys had determined whether petitioner should testify, and

---

[2] That theory related to an alleged alternative perpetrator of the Francke murder, Timothy Natividad.

the defense team hired an attorney to prepare petitioner for cross-examination. At some point while the state was presenting its case-in-chief, the preparation of petitioner for cross-examination was postponed. It was never rescheduled. Defense counsel attempted, before and during trial, to put together sufficient evidence to support an alibi defense but never succeeded in doing so. At the post-conviction trial, Abel testified that he had believed that petitioner should not testify in the criminal trial in part because of petitioner's demeanor and inconsistencies in his accounts, that he had explained those reasons to petitioner, and that he understood petitioner to have been persuaded. Thereafter, and before the defense rested, petitioner never told either of his attorneys that he wished to testify.

Petitioner argues, nevertheless, that he is entitled to post-conviction relief under our analysis in *Ashley v. Hoyt*, 139 Or App 385, 912 P2d 393 (1996). In *Ashley*, we concluded that criminal trial counsel provided inadequate assistance by disregarding his client's express request to testify in her own defense and resting the defense without calling his client. We stated:

> "Whatever valid reasons counsel might have had for *advising* his client not to testify—and we fully appreciate that a range of considerations, including tactical considerations, may justify such advice—the ultimate decision had to be hers. By disregarding his client's express desire to testify—indeed, by unilaterally usurping the decision to exercise that right—counsel rendered inadequate assistance."

*Id.* at 395 (emphasis in original).

Petitioner argues that his case is analogous to *Ashley*. In particular, petitioner points to evidence in the record to support his contention that he intended to testify at trial and contends that, like the attorney in *Ashley*, his defense counsel "disregard[ed] [their] client's express desire to testify" and "unilaterally usurped the decision to exercise that right."

■■ Petitioner's argument founders on our standard of review. As we recently noted in *Pratt v. Armenakis*, 201 Or App 217, 220, 118 P3d 821 (2005):

> "[O]ur review [in post-conviction appeals] is limited to determining whether there is *any* evidence in the record to support the post-conviction court's findings. *Ball v. Gladden*, 250 Or 485, 443 P2d 621 (1968). Under that standard of review, we do not reweigh the evidence or speculate whether the evidence might have supported other factual findings than those made by the trial court. We simply determine whether any evidence *does* support the findings of the trial court[.]"

(Emphasis in original.) Here, the post-conviction court found that petitioner was advised by defense counsel not to testify and that petitioner never informed either of his defense attorneys that he intended to testify against their advice. That finding was supported by evidence in the record. Thus, unlike in *Ashley*, petitioner's criminal defense counsel merely advised him not to testify and did not preclude him from doing so. Further, unlike the petitioner in *Ashley*, petitioner here never told his criminal defense counsel that he wished to testify on his own behalf. Because *Ashley* is materially distinguishable, the post-conviction court correctly rejected petitioner's "preclusion of testimony" claim.

Petitioner next argues that the post-conviction court erred in rejecting his claims that the trial court denied him the right to be heard conferred by Article I, sections 10 and 11, of the Oregon Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution by failing to address the concerns raised in the two letters he sent to the court during the criminal trial. *See* 203 Or App at 715 (describing letters). We reject without discussion petitioner's arguments concerning the first (March 31, 1991) letter. As to the second (July 1, 1991) letter, petitioner asserts that he had a right to be heard on his specific complaints regarding his attorneys' performance and that the trial court denied him that right because the colloquies on the record between petitioner and the trial court did not address the substance of petitioner's concerns as set forth in that letter. The post-conviction court found that the trial court had, in fact, given petitioner an opportunity to be heard. Implicit in petitioner's argument on appeal is an assertion that the post-conviction court erred in so concluding.

Petitioner's arguments miss the mark because they assume that the trial court had an obligation to explore extensively, on the record at petitioner's criminal trial, the nature of his dissatisfaction with defense counsel. That assumption is incorrect. *State v. Smith*, 339 Or 515, 123 P3d 261 (2005).

In *Smith*, which was decided long after the post-conviction proceedings here, the Supreme Court clarified the nature of a trial court's obligation in that respect. There, a criminal defendant expressed to the court on the day of trial that he was not satisfied with his counsel. The trial court did not inquire into the basis for the complaints but, instead, expressed confidence in the attorney. *Id.* at 517-19.

Ultimately, the Oregon Supreme Court affirmed the trial court's action.[3] The Supreme Court framed the issue as "whether the trial court erred by not inquiring into defendant's complaints about his appointed counsel." *Id.* at 521 (footnote omitted). The court acknowledged that Article I, section 11, as well as the Sixth Amendment, entitle a criminal defendant to the right to the adequate assistance of counsel and that, should that right be violated, the criminal defendant will be entitled to relief. *Id.* at 526. The court held, however, that nothing "suggests that a trial court constitutionally is required always to make an inquiry or factual assessment *during trial* into a defendant's complaint that his counsel is failing to provide adequate assistance." *Id.* at 527 (emphasis in original). Rather, the court noted, post-conviction proceedings were available to allow a criminal defendant after trial "to introduce evidence that trial counsel's representation failed to meet the required standard of professional competence[.]" *Id.* at 528. Thus, the court concluded that post-conviction proceedings provide "a constitutionally sufficient mechanism for a person convicted of a crime to raise any claim of inadequate counsel and to obtain appropriate relief." *Id.* (footnote omitted).

In so holding, the court noted "the disadvantages of a factual inquiry into a defendant's complaints about counsel

---

[3] In doing so, the court reversed our decision, which had remanded the case to the trial court for further proceedings. *State v. Smith*, 190 Or App 576, 80 P3d 145 (2003).

during trial[.]" *Id.* at 529. Those disadvantages included the difficulties of addressing claims that would require the court to elicit information from defense counsel about privileged communications, work product, and trial strategy, as well as the potential for disruption and delay of proceedings if a court is required to conduct a factual inquiry into adequacy of counsel in the midst of trial. *Id.* at 529-30. For all of those reasons, the court concluded that post-conviction proceedings "ordinarily will be superior to a truncated factual inquiry during a criminal trial as a way to determine whether defense counsel was inadequate." *Id.* at 530.

■ This case *is*, of course, a post-conviction proceeding. In this proceeding, petitioner has had the opportunity to pursue all of his substantive claims as to why defense counsel at his underlying trial provided inadequate assistance.[4] However, the claim for relief at issue here is not a substantive claim concerning inadequate assistance—rather, petitioner's claim is that the *trial court* was required to conduct a more elaborate inquiry into his complaints about counsel during the course of the criminal proceeding. *Smith*, however, makes it clear that the criminal trial court had no constitutional obligation to engage in such an inquiry. Accordingly, and consistently with *Smith*, we reject petitioner's arguments concerning the trial court's treatment of his July 1, 1991, letter.

 We next address petitioner's assignment of error pertaining to the post-conviction court's failure to set aside the judgment and reopen the proceedings in order to allow him to obtain additional DNA testing of the hair found on Francke's clothing. Petitioner argues that, if he had been able to have additional testing done, he might have been able to show that his DNA did not match that of the hair—and, if that proved to be the case, he could have alleged an additional claim of inadequate assistance based on counsel's failure to conduct DNA testing of the hair.

_____

[4] We note that, in the context of his claim of inadequate assistance of counsel, petitioner did, in fact, raise some of the issues raised in his letter to the trial court. The post-conviction court resolved those issues against petitioner, and they are not at issue on appeal.

Petitioner's argument concerning the DNA matter is imprecise. However, we understand petitioner to assert that due process required the court to reopen the record to allow him to attempt to develop evidence to support a claim for post-conviction relief *that he had not yet pleaded*. That is, in petitioner's view, the post-conviction court was required to reopen and delay its disposition so as to give petitioner an opportunity to obtain testing that might—or might not—support an additional, but as yet unpleaded, post-conviction relief claim.

■ Petitioner acknowledges that we necessarily apply an "abuse of discretion" standard in reviewing the post-conviction court's decision not to grant that requested relief. Under that standard, we will not reverse a trial court's ruling unless it was "not justified by and clearly against the evidence and reason." *Lutz v. State of Oregon*, 130 Or App 278, 285, 881 P2d 171 (1994).

■ The court's ruling was not an abuse of discretion for either of two reasons. First, as noted, the evidence that petitioner sought further opportunity to adduce did not relate to any pleaded claim—it went to a claim that had not been pleaded and would be pleaded only if the testing produced a particular result. Second, in opposing petitioner's motion for additional testing, the state submitted evidence that the type of further testing contemplated by petitioner had not yet been available as of the time of his criminal trial in 1991. Consequently, criminal defense counsel could scarcely have been constitutionally inadequate for failing to obtain a type of DNA testing that did not yet exist. We thus reject petitioner's assignment of error pertaining to additional DNA testing.

We turn, finally, to petitioner's argument that his criminal defense counsel were constitutionally inadequate because they failed to assert that petitioner was not eligible for a "true life" sentence. To succeed on that claim, as on any other claim of inadequate assistance of counsel, petitioner must show that his counsel "failed to exercise reasonable professional skill and judgment, and that petitioner suffered prejudice as a result." *Lichau v. Baldwin*, 333 Or 350, 359, 39 P3d 851 (2002).

Before addressing the substance of petitioner's arguments, we must first put those arguments in historical context. Thus, we begin by briefly describing the state of the law regarding punishment for aggravated murder at (1) the time of Francke's murder in January 1989 and (2) the time of petitioner's criminal trial, from March to July 1991.

In January 1989, Oregon law provided for only two possible sentences for aggravated murder: life imprisonment with the possibility of parole; and the death penalty. There was no possibility of a "true life" sentence—*i.e.*, life imprisonment *without* possibility of parole.

Later in 1989, the legislature amended ORS 163.150 to provide for that third possible sentence for aggravated murder, *viz.*, "true life." *See generally State v. Wille,* 317 Or 487, 501-04, 858 P2d 128 (1993) (describing statutory change). Under the revised sentencing scheme, the "true life" sentence was, in essence, the default sentence that an aggravated murder defendant would receive, because the life sentence *with* the possibility of parole would be imposed only if the jury found mitigating circumstances, and the death penalty would be imposed only if the jury found aggravating circumstances. *See id.* at 503-04. That differed from the previous scheme, under which life imprisonment with the possibility of parole was the "default"—that is, unless the jury made the additional findings necessary for imposition of a death sentence, the defendant received life with the possibility of parole. Because the "default" sentence under the new scheme was harsher than the "default" sentence under the old scheme, the court in *Wille* concluded that retroactive application of the new scheme violated the *ex post facto* provision of Article I, section 21, of the Oregon Constitution. *Id.*

Against that backdrop, we return to the substance of petitioner's argument. Here, petitioner alleged that counsel provided inadequate assistance by failing to object on *ex post facto* grounds to the court's submission to the penalty-phase jury the possibility of petitioner being sentenced to "true life." The post-conviction court rejected petitioner's claim, finding that petitioner had waived his *ex post facto* constitutional protections concerning the "true life" sentencing option. *See State v. McDonnell,* 329 Or 375, 388, 987 P2d 486 (1999)

(holding that a criminal defendant could knowingly and intentionally waive his *ex post facto* rights and seek sentencing under the new scheme even if his crime had been committed when the old scheme was in effect).

In so concluding, the post-conviction court relied on certain evidence in the record referred to in the following factual findings:

"(1) The Defense during the initial stages of potential juror voir dire examination made reference to the true life option. When the legal *ex post facto* issue was placed on the record by Deputy District Attorney Thomas Bostwick on April 1, 1991, Mr. Storkel told the Court that the issue would be discussed with Mr. Gable. [T]he Court's conclusion on the record was, however, that the Parties were in agreement that the true life option could be discussed during voir dire proceeding to which both acceded. On April 2, 1991, Mr. Abel told the Court that the matter had still not been discussed with Mr. Gable, and that the Defense would not be addressing that issue with the prospective jurors. Mr. Gable was present during the proceedings on both April 1, 1991, and April 2, 1991.

"(2) The Trial Judge Greg West testified that the matter was discussed, perhaps in chambers, and his impression was that the choice of the Defense was to go with the life without parole as a defense strategy to give jurors a viable choice other than the death penalty or life with parole. This assumption involving the defense strategy which included the life without parole option would be reinforced by the fact that, as noted in the Summary of the proceedings above:

"(i) The Defense specifically requested the life without parole option as a written requested Jury Instruction;

"(ii) The Court prepared proposed Jury Instructions incorporating the life without parole option which he presented to the Parties the afternoon before giving preliminary instructions to the Jury at the beginning of the Penalty Phase of the trial. These same provisions given in the preliminary instructions, including the three options, that is: 1) the death penalty, 2) the life without parole penalty; 3) the life with parole penalty, were included in the Court's final Jury Instructions.

"(iii) Mr. Gable upon the return of the jury verdict waived time and requested that he be sentenced immediately. Everyone involved, that is, the Court, the State and the Defense had no question from the Jury's Answers to the Verdict Questions that the result was the life without parole penalty. Mr. Gable, from the beginning when the issue was first raised during jury selection, had the right to assert the *ex post facto* [*sic*] and never asserted such right."

Based on those findings, the post-conviction court determined that "a waiver of the *ex post facto* protections * * * can be [inferred] from the totality of the circumstances reflected in the record of this case."

■ Petitioner argues that the post-conviction court erred in concluding that he waived any *ex post facto* objection to submitting the "true life" sentencing option to the jury. In particular, petitioner emphasizes that a waiver must involve an intentional relinquishment of a known right and that such a waiver may not be inferred on a silent record. *See, e.g., Boykin v. Alabama,* 395 US 238, 243, 89 S Ct 1709, 23 L Ed 2d 274 (1969). Petitioner asserts that the record here is, in fact, "silent." The state responds that the record is not "silent" as to a waiver of the *ex post facto* objection by petitioner— and, particularly, that it may be inferred from the above-quoted factual findings that the post-conviction court "implicitly rejected petitioner's testimony that counsel did not talk to him about the true-life option, or that he otherwise did not know that he had the right to object to an instruction to that effect."[5]

---

[5] The Oregon Supreme Court has recently discussed how and when inferences may be drawn on a "silent record" that a criminal defendant has waived a constitutional right. *See State v. Probst,* 339 Or 612, 124 P3d 1237 (2005). The court made it clear that, in a situation where the validity of a waiver of a right in a prior proceeding is being challenged in a collateral attack, the party asserting a violation of the constitutional right bears the burden of persuasion on that issue. *Id.* at 628-29. While the present case obviously concerns a collateral attack, this is not a case in which either party is relying on the *absence* of evidence to invoke a presumption, and petitioner is not suggesting that he did not bear the burden on this question. Here, as explained below, petitioner adduced affirmative evidence in the post-conviction proceeding that he had not known of his *ex post facto* rights, much less waived those rights during his criminal trial; the state responded with evidence from which, it contended, a finder of fact could conclude that the right had been waived. Thus, we do not perceive this case as involving the classic situation in which a court is asked to apply a "presumption" based on a "silent record."

As explained below, we conclude that, on this record, the post-conviction court erred in finding that petitioner had waived any objection, based on *ex post facto* protections, to the submission of the "true life" sentencing option to the jury. In particular, there is no evidence that criminal defense counsel actually conferred with petitioner regarding that matter, much less that petitioner agreed to waive the *ex post facto* objection. Thus, counsel "failed to exercise reasonable professional skill and judgment," *Lichau*, 333 Or at 359, in failing to confer with petitioner regarding any waiver of the *ex post facto* objection. Nevertheless, as also explained below, our conclusion in that regard does not compel the allowance of post-conviction relief. Rather, the post-conviction court never determined whether petitioner was prejudiced by his attorneys' default. Specifically, if counsel had engaged in a constitutionally adequate discussion with petitioner, would petitioner then have elected to waive his objection to the submission of the "true life" option to the jury? Because the post-conviction court never rendered a finding on that matter, we remand for it to do so.

At the outset, we must clarify the post-conviction court's finding quoted above that "the legal *ex post facto* issue was placed on the record by Deputy District Attorney Thomas Bostwick on April 1, 1991[.]" That statement must be understood in the context of the post-conviction court's earlier factual finding that set forth in detail the discussion that took place on the record on April 1, 1991, among the trial court, Bostwick, and Storkel, with petitioner present. That colloquy occurred in the context of jury *voir dire*. Bostwick stated:

> "[W]hat I want to put on the record this morning, and I have discussed it with counsel for the defense is that the crime in this particular instance was committed prior to the passage of that new section of the statute which allows the jury to impose true life without the possibility of parole. And my discussion with counsel is that an argument could be made by the defendant that since the crime occurred prior to the passage of that statute, that he might argue to the Court and elect to be tried under the old statute which would not allow for the true life statute, would only allow for life with the possibility of parole and the death penalty. I don't know

exactly what the option of the defense would be in this particular case, and there [are] arguments that could be made by the state based upon they're [sic] election, but I just wanted to bring that to the Court's attention and bring it to Mr. Storkel and Mr. Abel's attention at this time so that they might discuss that with the defendant and bring it to the Court. I don't want Mr. Storkel addressing the jury about the three options in the penalty phase and then having the defense at a later date raise the issue and successfully argue to the Court that true life is not an option in this particular case and then have the jury misinformed at this stage."

Storkel responded that he and Abel would discuss the matter with petitioner and that he "didn't think it was going to be an issue[.]" Storkel further noted that petitioner had been charged under the new version of the aggravated murder statute and thought that "the three options are the way that the Court would probably rule."

On April 2, the court took up the matter again. At that time, Abel told the court that defense counsel had *not* discussed the issue with petitioner and that "we don't want to make a decision at this stage of the proceedings[.]"

In sum, when the post-conviction court found that "the *ex post facto* issue" had been discussed in court on April 1, 1991, that must be understood to mean that the retroactive application of the amended aggravated murder statute had been discussed. It cannot be understood to mean that any constitutional *ex post facto* limitations on the application of the amended sentencing statute were discussed, or—critically for our purposes—that any type of waiver occurred on April 1 or 2. Although the lawyers and trial judge may have *understood* that the retroactive application of the new law had underlying *ex post facto* implications, those implications were never discussed on the record with petitioner present. That is, nothing in that colloquy reasonably alerted petitioner that the "true life" sentencing option could be applied to him only if he waived his constitutional right not to be subject to the later-enacted sentencing scheme. Thus, the record of the April 1 and April 2 proceedings does not, in fact, contain any waiver by petitioner.

The state contends, nevertheless, that we may infer from the post-conviction court's findings that the post-conviction court must have "rejected petitioner's testimony that counsel did not talk to him about the true-life option." That is, the state suggests that, if the post-conviction court had credited petitioner's testimony in that regard, it would have granted the requested relief and, thus, the trial court must have found the converse, *viz.*, that petitioner *did* confer with his attorneys and knowingly waived his *ex post facto* objection. From that premise, the state reasons that there was evidence supporting a finding of waiver.

■　　We reject the state's inferential premise. The record is devoid of *any* evidence that defense counsel *ever* discussed the issue with petitioner. The only evidence on that point—the colloquies of April 1 and 2, 1991, recounted above, and petitioner's testimony—supports petitioner's assertion that counsel *never* discussed the issue with him. There is no evidence from criminal defense counsel themselves, or from any other source, that counsel ever explained the *ex post facto* matter to petitioner, much less that petitioner knowingly agreed to forego any objection. In sum, aside from petitioner's *controverting* evidence, this record contains no affirmative evidence as to any waiver. Or, put another way, the only evidence in this record is that petitioner did not personally waive his constitutional right. Thus, the inference that the state posits is not supported by any evidence in the record.[6]

Still, the state contends that, in these circumstances, a waiver can be found even in the absence of evidence that petitioner's counsel discussed with him the waiver of the constitutional right. That is, the state contends that, regardless of whether petitioner himself personally waived his *ex post facto* rights on the record, such a waiver could be, and was, effectuated by the conduct of his counsel. In

---

[6] Given the absence of any evidence of waiver, the state cannot avail itself of the presumption that, "[w]hen the trial court has failed to make express findings on all pertinent facts *and there is conflicting evidence in the record as to those facts*, this court will presume that the trial court found facts consistent with its ultimate conclusion." *State v. Weaver*, 319 Or 212, 214 n 1, 874 P2d 1322 (1994) (emphasis added); *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968) (announcing same principle).

addressing that contention, we must examine case law concerning what constitutes a sufficient waiver:

> "What suffices for waiver depends on the nature of the right at issue. '[W]hether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake.' *United States v. Olano*, 507 US 725, 733 (1993). For certain fundamental rights, the defendant must personally make an informed waiver. *See, e.g., Johnson* * * *, 304 US [at] 464-65 * * * (right to counsel); *Brookhart v. Janis*, 384 US 1, 7-8 (1966) (right to plead not guilty). *For other rights, however, waiver may be effected by action of counsel.* 'Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has—and must have—full authority to manage the conduct of the trial.' *Taylor v. Illinois*, 484 US 400 (1988). * * * Thus, decisions by counsel are generally given effect as to what arguments to pursue, see *Jones v. Barnes*, 463 US 745 (1983) [and] what evidentiary objections to raise, see *Henry v. Mississippi*, 379 US 443, 451 (1965) * * *. Absent a demonstration of ineffectiveness, counsel's word on such matters is the last."

*State v. Langley*, 331 Or 430, 449-50, 16 P3d 489 (2000), *quoting New York v. Hill*, 528 US 110, 120 S Ct 659, 664, 145 L Ed 2d 560 (2000) (emphasis added).

We know of no case law describing the right to be free from *ex post facto* laws to be so "fundamental" as to require that "the defendant must personally make an informed waiver." Conversely, we know of no case law that classifies the right to be free from *ex post facto* laws as a "conduct of the trial"-type of right that may be waived by counsel.[7]

---

[7] We appreciate that the issue is unlikely to arise with respect to most *ex post facto* laws because, in most contexts, there would be no conceivable reason why either a criminal defendant or his counsel would waive the right to be free from a more onerous law. The present situation is unusual, and perhaps unique, in that the 1989 amendment to the aggravated murder statute that the court held to be an *ex post facto* law in *Wille* is an amendment that, for tactical reasons, many criminal defendants would choose to have applied in their cases: Although the "default" sentence is harsher, the new scheme allows a sentencing jury to consider two sentencing alternatives to a death sentence for aggravated murder, rather than just one. *See, e.g., State v. Guzek*, 336 Or 424, 429, 86 P3d 1106 (2004), *cert granted*, 544 US 998, 125 S Ct 1929, 161 L Ed 2d 772 (2005) (a defendant who committed his crimes

Consequently, in determining whether the right in question should be deemed to be one that must be waived personally by a criminal defendant, rather than by the defendant's attorney, we refer, more generally, to decisions of the Oregon Supreme Court concerning waiver of *ex post facto* rights.

As noted, the first case in which this issue arose was *McDonnell*. There, the court stated:

"As is true in many other legal settings, a criminal defendant may knowingly and intentionally relinquish, and thereby waive, the protection of a pertinent statute or constitutional provision:

" 'Rights, even of constitutional dimension, can be waived. *See, e.g., State v. Meyrick*, 313 Or 125, 132, 831 P2d 666 (1992) (illustrating principle—waiver of right to counsel). * * *

" '* * * * *

" ' "A waiver is an intentional relinquishment or abandonment of a known right or privilege." *State v. Meyrick, supra*, 313 Or at 132. Although a waiver must be intentional, there is no particular formula for determining whether a waiver has occurred. 'Whether there has been an intentional relinquishment or abandonment of a known right or privilege will depend upon the particular circumstances of each case * * *.' *Ibid.*

"*State v. Hunter*, 316 Or 192, 199-201, 850 P2d 366 (1993).

"Our examination of the circumstances here leads us to conclude that, under the definition of waiver set out in *Hunter*, defendant's decision not to invoke the protection of the *ex post facto* clause in Article I, section 21, in a timely manner against the application of ORS 163.150(5)(a) (1993) in the remand proceeding constituted a waiver of his right to that protection. *Defendant made it clear to the trial court that he wanted the jury to consider his case under ORS 163.150(5)(a) (1993), in order potentially to receive a true life sentence. Defendant's arguments to the trial court demonstrate that he was aware that he could invoke his constitutional right to protection against the enforcement of ex post*

in 1987 chose to have jury instructed on "true life" option); *see also Langley*, 331 Or at 438-40; *State v. Rogers*, 330 Or 282, 290-91, 4 P3d 1261 (2000); *McDonnell*, 329 Or at 388-92.

*facto laws, but he chose intentionally to relinquish that right. The written waiver that defendant filed, in which he expressed in elaborate terms his desire to waive his constitutional rights, amply confirms that defendant's decision not to invoke his constitutional protection against ex post facto laws was an intentional relinquishment of a known right."*

*McDonnell*, 329 Or at 388-89 (emphasis added).

Thus, the facts in *McDonnell* clearly supported a conclusion that a waiver had occurred, given that a "written waiver" expressed in "elaborate terms" the defendant's desire to have the new law applied. The facts in *McDonnell* are obviously materially distinguishable from those here—and are useful only to the extent that they describe what *is* a sufficient waiver of *ex post facto* protections by a defendant subject to punishment under ORS 163.150, and not what *is not* a sufficient waiver. Still, the court's reliance in *McDonnell* on *Hunter*, and the test set forth in *Hunter*, is instructive. Consequently, we turn to *Hunter*.

In *Hunter*, the issue concerned whether a statutory speedy trial right had been waived, and the court followed the standard "intentional relinquishment or abandonment of a known right or privilege" formulation in addressing the question. *Hunter*, 316 Or at 201. However, in *Hunter*, unlike in *McDonnell*, the circumstances of the waiver were at issue. In *Hunter*, the trial court had held that defense counsel had waived the right in question. *Id.* at 194. In reviewing that determination, the Oregon Supreme Court focused not on what defense counsel had said, but, instead, on what the defendant actually knew:

"Defendant's exchange with the court shows that defendant was apprised that his trial might not occur within the 90-day speedy trial period if the continuance were granted. On learning of this possibility, defendant did not insist on being tried within the 90-day period. Instead, he indicated that he 'just didn't want this to be strung out for a long period of time.' When the court told defendant that he would not have to return to court 'too many times,' defendant voiced his satisfaction. *We think that defendant's words, when read in the context of the court's statements, as supplemented by defense counsel's statements, show that*

> *defendant no longer insisted on being tried within the 90-day speedy trial period.*"

*Id.* at 201-02 (emphasis added).

*State v. Rogers*, 330 Or 282, 4 P3d 1261 (2000), also involved waiver of the right to be free of an *ex post facto* sentencing law. There, the court again relied on *Hunter* for the formulation of the proper test and concluded that written and oral submissions by the defendant established an intentional relinquishment of a known right. *Id.* at 291. Similarly, in *Langley*, the court held that an intentional relinquishment of a known right was established because the defendant had "submitted a written waiver to the court." 331 Or at 439; *see also Guzek*, 336 Or at 429 (the defendant had "expressly waived all *ex post facto* guarantees that otherwise would have protected him from retroactive application of the true-life option").

Thus, in each case in which the Oregon Supreme Court has discussed a defendant's waiver of constitutional *ex post facto* protections, the court has explicitly noted that the defendant had personally and expressly waived the right. Moreover, in doing so, the court adopted the framework for the inquiry set forth in *Hunter*, where the court looked to the "defendant's words" and the "court's statements, as supplemented by defense counsel's statements," to determine if a valid waiver had occurred. *Hunter*, 316 Or at 201. We thus conclude that, to determine whether petitioner waived the *ex post facto* objection to the submission of the "true life" option, we must look to his own words and conduct—and not just to the court's and counsel's statements at trial. With the inquiry so framed, we return to the circumstances here.

As noted, during *voir dire* of the jury, the prosecutor raised the issue of whether the amended statute applied, noting that "an argument could be made by the defendant that since the crime occurred prior to the passage of that statute, that he might argue to the Court and elect to be tried under the old statute[.]" Defense counsel replied that petitioner had been charged under the amended version of the statute and expressed an opinion that "the three options are the way that the Court would probably rule." *See* 203 Or App at 727 (setting out colloquy). Both that day (April 1) and the following

day, defense counsel told the court that the defense did not want to make a decision on the sentencing options at that point—and that defense counsel had *not* discussed the matter with petitioner. *See* 203 Or App at 724.

Under the analysis prescribed in *Hunter*, and adhered to in subsequent Supreme Court decisions reviewing sentences under ORS 163.150, no waiver can be inferred based on the colloquies of April 1 and April 2. That is so for at least two reasons. First, although petitioner could be expected to have been aware that a potential issue existed as to the sentencing options available, the exchanges quoted above did not alert him that he had a *right* to be sentenced under the old statute and that, unless he waived that right, he could not be sentenced under the new statute. Second, petitioner's *ex post facto* rights could not be deemed to be waived at that point, because, as noted, neither petitioner personally, nor his attorneys in petitioner's presence, agreed to any waiver. Rather, as noted, petitioner's counsel informed the court that the defense team did not want to make a decision on that matter at that point.

■ The post-conviction court also rendered findings that defense counsel had discussed the applicability of the amended sentencing scheme in chambers and that defense counsel had requested a jury instruction on true life sentencing. *See* 203 Or App at 724. Those findings are supported by evidence in the post-conviction record—and those findings do, in fact, support a conclusion that *defense counsel* made a strategic choice that the jury should be apprised of the "true life" sentencing option. If petitioner's lawyers alone could have validly waived petitioner's *ex post facto* protections, then the post-conviction court's findings regarding counsel's conduct would be sufficient to establish a legally sufficient waiver. But, as noted, the analysis prescribed in *Hunter*, and applied in *McDonnell, Langley*, and *Guzek*, requires more: The *criminal defendant* must personally make an informed waiver of his or her *ex post facto* rights. Here, that did not occur.

Finally, petitioner's failure to personally object during sentencing is immaterial to the present inquiry. Given

that petitioner contends he was not informed of the constitutional right at stake, his failure to object is entirely consistent with that ignorance.

In sum, there is no evidence in this record that petitioner knew of his *ex post facto* rights regarding the application of the amended version of ORS 163.150, much less that he intentionally waived a "known" right. Consequently, the post-conviction court erred in concluding that a waiver could "be implied from the totality of the circumstances reflected in the record of this case."

 Petitioner contends that, because he did not waive his *ex post facto* rights, his counsel provided constitutionally deficient assistance in failing to advise him of those rights and, ultimately, in failing to raise the *ex post facto* objection to submission of the "true life" option. We conclude that counsel did breach the standard of constitutionally adequate representation in that regard. The amended version of ORS 163.150 was, obviously, enacted after petitioner committed his crimes. That amended statute provided for the imposition of a default sentence that was harsher than the default sentence at the time the crime was committed. *See Wille,* 317 Or at 501-03. Thus, the *ex post facto* implications were apparent. Given those circumstances, constitutionally adequate counsel would have discussed with petitioner the pros and cons of waiving the right and allowing the jury to consider an additional sentencing option. It was not reasonable for counsel to ignore the *ex post facto* issue and proceed with sentencing under the new statute without discerning whether petitioner wished to waive his right not to be subjected to the amended sentencing scheme.

Our determination that counsel was constitutionally deficient with respect to the *ex post facto* matter does not, by itself, entitle petitioner to post-conviction relief. Rather, petitioner must show not only that his counsel failed to exercise reasonable professional skill and judgment, but also that he suffered prejudice as a result. As noted, prejudice occurs when counsel's deficient performance had "a *tendency to affect the result* of the prosecution[.]" *Stevens v. State of Oregon,* 322 Or 101, 110, 902 P2d 1137 (1995) (internal quotation marks omitted; emphasis in original).

Here, in the most literal sense, availability of the "true life" sentence had more than a "tendency" to affect the ultimate outcome of the prosecution—that *is* the sentence that petitioner actually received. However, the appropriate inquiry regarding actionable prejudice is considerably more sophisticated than such sophism. If petitioner would, in fact, have waived his *ex post facto* rights in these circumstances (as have many similarly situated criminal defendants, *see* 203 Or App at 728 n 6), then petitioner was not prejudiced by his counsel's default. That is, petitioner might have waived those protections in all events because it was to his practical, tactical benefit to do so.

Here, petitioner testified in the post-conviction trial, as well as in his earlier deposition, that, if counsel had informed him of the issue, he would not have waived the right and would have opted to have the jury choose between a sentence of life with the possibility of parole and the death penalty. The state responds that that testimony is self-serving 20-20 hindsight, with petitioner hoping to obtain a "life with possibility" sentence, with the death penalty being (in defendant's view) precluded by double jeopardy principles.[8] In that regard, the state reiterates that, like the defendants in *Guzek, Langley, Rogers,* and *McDonnell,* petitioner had every reason at trial to give the jury an additional alternative to the death penalty.

The post-conviction court never reached the question of prejudice on the *ex post facto* matter—and, thus, never made a factual finding regarding petitioner's credibility in that regard. We cannot resolve that disputed factual matter on appeal. Accordingly, we must remand the case to the post-conviction court for that court to make the requisite factual findings and to determine whether petitioner is entitled to post-conviction relief because of his attorneys' default in failing to confer with him regarding the waiver of *ex post facto* protections in submitting the "true life" option to the jury.

Vacated and remanded.

---

[8] The state disputes petitioner's assumption in that regard and contends that, even if petitioner were to secure post-conviction relief, the jury in a new penalty-phase proceeding would not be so limited. Given the nature of our disposition, we necessarily imply no view as to that matter.